**GENESCO INC., Plaintiff,**

v.

**MONUMENTAL LIFE INSURANCE COMPANY and Jaffe-Spindler Company, Defendants,**

**JAFFE–SPINDLER COMPANY, Plaintiff,**

v.

**GENESCO, INC., Defendant.**

**Civ. A. Nos. 81–2195–15, 82–496–15.**

United States District Court, D. South Carolina, Florence Division.

June 17, 1983.

William C. Stork, Columbia, S.C., for Genesco.

James C. McLeod, Florence, S.C., and Robert S. Moraff, Totowa, N.J., for Jaffe-Spindler.

Robert W. Dibble, Jr., Robert E. Stepp, Columbia, S.C., for Monumental Life.

## ORDER

HAMILTON, District Judge.

This matter was tried by the court sitting without a jury during the period June 1—June 3, 1983. Having carefully considered the evidence, the credibility of the witnesses and the briefs and arguments of counsel, the court hereby enters its Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Fed.R.Civ.P.

### I. *Parties*

1. Genesco, Inc., ("Genesco") is a corporation organized under the laws of the State of Tennessee with its principal office and place of business at Genesco Park in Nashville, Tennessee.

2. Monumental Life Insurance Company ("Monumental") is a Maryland corporation with its principal office and place of business in Baltimore, Maryland.

3. Jaffe-Spindler Company ("Jaffe-Spindler") is a limited partnership organized under the laws of the State of New York with its principal office and place of business at 111 First Street, Jersey City, New Jersey. Jaffe-Spindler appeared herein through its General Partner, Benjamin D. Jaffe, who resides at 1401 North Venetian Way, Miami Beach, Florida (Order entered March 31, 1982).

### II. *Prior Proceedings*

4. The original action, Civil Action No. 81–2195–15, was initiated by Genesco in the Court of Common Pleas of Marlboro County on September 10, 1981. The complaint named as defendants (i) I.R.E. Realty Advisors, Inc., the General Partner of and d/b/a Investors Tax Sheltered Real Estate, Ltd., Series II ("I.R.E."), which Genesco assumed to be the landlord under the lease pursuant to which Genesco occupied certain premises in a shopping center in Bennettsville, South Carolina, and (ii) Monumental, mortgagee of said shopping center and collateral assignee of landlord's interest in said leases with Genesco and the Great Atlantic and Pacific Tea Company. The complaint alleged that, notwithstanding notice, and its obligation to do so, I.R.E. had failed and refused to stop severe roof leaks, rendering the leased premises incapable of being occupied and enjoyed. The State Court ordered the defendants to show cause on October 5, 1981, why the equitable relief sought in the complaint should not be granted.

5. On or about October 5, 1981, prior to the hearing on the Order to Show Cause, the defendants removed the action to this Court. On the same date, the defendants filed an answer to Genesco's complaint denying that the lessor had failed and refused to comply with its obligations under the lease. Defendants also counterclaimed, alleging that Genesco misrepresented its reasons for vacating the premises and was simply attempting to break a lease obligation. Genesco denied the allegations contained in defendants' counterclaim.

6. By motion filed on October 12, 1981, Genesco renewed its petition in this Court for an Order requiring defendants to show cause why they should not be enjoined during the pendency of this action from pursu-

ing any default due to Genesco's tender of rentals due under said lease into the registry of this Court. Because of settlement negotiations among all parties, this motion was not heard until March 31, 1982. During the pendency of this motion, Genesco continued to pay into this Court the monies due and owing under the Lease.

7. On March 12, 1982, Jaffe-Spindler filed Civil Action No. 82–496–15 in this Court against Genesco. The complaint alleged that Jaffe-Spindler was the true owner of said shopping center and landlord under the lease. The complaint demanded, among other things, payment by Genesco to Jaffe-Spindler of accrued rent allegedly withheld by Genesco since September 1981. Various motions had been filed by the parties, all of which came before the Court for hearing on March 31, 1982.

8. By Order entered on March 31, 1982, with the consent of the attorneys for all parties, the Court:

(i) entered summary judgment under Rule 56 of the Federal Rules of Civil Procedure in favor of I.R.E., dismissing it as a party defendant and counter-claimant in Civil Action No. 81–2195–15;

(ii) allowed Benjamin D. Jaffe, as General Partner of Jaffe-Spindler, to be made a party defendant in Civil Action No. 81–2195–15 and consolidated Civil Action No. 81–2195–15 and Civil Action No. 82–496–15 with permission for Jaffe-Spindler to appear and prosecute its complaint by and through its General Partner Benjamin D. Jaffe, subject to its compliance with certain legal requirements.[1]

(iii) ordered (a) that funds previously deposited by Genesco with the Clerk of this Court be paid immediately to Jaffe-Spindler; and (b) that payment of said funds would not be a waiver by Genesco of its claims of constructive eviction from the leased premises and reserved to Genesco the right to claim refund of all payments made to Jaffe-Spindler from October 1, 1981 if a constructive eviction was found; and

(iv) ordered (a) that Genesco, from the date of the Order, send to Jaffe-Spindler all monetary payments under the terms of the lease as and when they become due and (b) further provided that Jaffe-Spindler waived its rights to claim a default (except for counsel fees, interest and costs) due to the non-payment by Genesco of sums due under the subject lease prior to March 31, 1982.

9. Genesco answered the Jaffe-Spindler complaint on April 21, 1982 alleging a constructive eviction arising from Jaffe-Spindler's failure to maintain the roof in good repair and seeking damages as a result of Jaffe-Spindler's failure to repair the leaking roof, a claim which was abandoned by Genesco at trial on June 2, 1983.

10. Monumental filed an amended answer to the complaint of Genesco and, cross-claimed against Jaffe-Spindler for waste seeking recovery for the dimunition in value of the real property covered by its mortgage and the Genesco lease covered by its collateral assignment of leases.

## FINDINGS OF FACT

11. On January 5, 1970, (Ex. 1 of Genesco and Monumental) Bennett Properties Corp., lessor, and S.H. Kress and Company, lessee, entered into a lease for a term of 25 years commencing on August 12, 1970, covering the following property, which is the subject of this litigation:

All that certain lot, piece or parcel of land, situate and being near the City of Bennettsville, County of Marlboro, State of South Carolina, and being more particularly described as follows:

BEGINNING at a point on the Southern Right of Way of Route 15/401 By-Pass at Bennettsville, S.C. and being 116.3 ft. East of the Point of Curve, thence with Right-of-Way N. 58—46 E. 62.3 ft. to an iron; thence N. 74–15 E. 96.3 ft. to an iron on Carrollton Ave. Right of Way; thence with Carrollton Ave. R/W N. 89—45 E. 477.2 to iron; thence S. 31—14 E. 423.2 ft. to an iron on Rear Property Line

---

1. See Section 33–43–370(A) of the South Caroli- na Code of Laws 1976, as amended.

Point of Curve, thence with Right of Way n. 58—46 E. 62.3 ft. to an iron; thence N. 74—15 E. 96.3 ft. to an iron on Carrollton Ave. Right of Way; thence with Carrollton Ave. R/W N. 89—45 E. 477.2 to iron; thence S. 31—14 E. 423.2 ft. to an iron on Rear Property Line; S. 58—46 W. 594 ft. to iron; thence N. 31—14 W. 544 ft. to an iron on rear line of Reserved Lot; thence N. 58—46 E. 30 ft. to iron; thence N. 31—14 W. 150 ft. to beginning. All containing 3.49 Acres.

12. On June 8, 1970, (Genesco Ex. 2 and Monumental Ex. 3) that lease was modified by an agreement between Milton Schwartz (successor to Bennett Properties Corp.) and Genesco (successor by merger to S.H. Kress and Company). This lease as modified will be referred to as the Genesco lease. A short form of the Genesco lease (Monumental Ex. 4) was executed on June 8, 1971, and recorded in the Office of the Clerk of Court of Marlboro County in Deed Book 123 at page 36.

13. (Monumental Exs. 1, 3). The Genesco lease provides for the payment of annual rental in the amount of Sixty-Eight Thousand Seven Hundred Fifty ($68,750.00) Dollars in equal monthly installments payable on the first day of each month in advance. The Genesco lease, with respect to the construction of improvements upon the leased premises provides, *inter alia;*

7. (a) Lessor shall erect upon the Leased Premises a retail store building having approximately 35,000 square feet of floor space all in accordance with final plans and specifications approved by Lessor and Lessee as hereinafter provided . . .

(b) All buildings and improvements erected by the Lessor on the Leased Premises shall be designed and erected to meet all physical requirements of the site and to meet all conditions relative to soil and water . . .

14. (Monumental Ex. 5). Am-Cal Construction Corp. was the contractor selected to construct the improvements on the property covered by the Genesco lease.

15. (Monumental Ex. 5). By letter to Am-Cal Construction Corp. dated November 11, 1970, E.F. Kerby, building contractor for Genesco, accepted the "building as having been fully completed in accordance with the requirements of the lease."

16. (Monumental Ex. 6). On November 20, 1970, Milton Schwartz, lessor, and the Great Atlantic & Pacific Tea Company, Inc., lessee entered into a lease covering the following property:

All that certain lot, piece or parcel of land, situate and being near the City of Bennettsville, County of Marlboro, State of South Carolina, and being more particularly described as follows:

BEGINNING at an iron stake on Carrollton Avenue R/W at the North Easterly corner, of Kress Store Lot thence with Carrollton Ave. N. 89° 45 E. 140 ft. to an iron; thence S. 31° 14' E. 569.2 to iron on rear line; thence S. 58° 46' W. 120 ft. to iron (South Easterly corner of Kress Store Lot); thence N. 31° 14 W. 641.3 to iron, the beginning point. All containing 1.67 acres and lying and being in Marlboro County, S.C.

This lease will be referred to as the A & P lease. The A & P lease covers the improvements which adjoin (party wall) the premises covered by the Genesco lease. A short form of the A & P lease was executed on April 21, 1971, and recorded in the Office of the Clerk of Court for Marlboro County in Deed Book 122 at page 266. (Monumental Ex. 7).

17. (Genesco Ex. 4 and Monumental Ex. 8). Milton Schwartz conveyed the two parcels of land described above, together with, all and singular, the rights, members, hereditaments and appurtenances thereto, to Hymil Realty Corp. by deed dated June 3, 1971, and recorded in the office of the Clerk of Court for Marlboro County on June 11, 1971, in Deed Book 123 at page 40.

18. Hymil Realty Corp. borrowed Six Hundred Sixty Thousand ($660,000.00) Dollars from Monumental. The loan is evidenced by a mortgage note (Monumental Ex. 9) dated June 3, 1971, executed by Hymil Realty Corp. in favor of Monumen-

tal. Monumental has advanced the full amount of the note.

19. In order to secure the payment of its mortgage note, Hymil Realty Corp. executed in favor of Monumental (1) a mortgage of real estate (Genesco Ex. 5 and Monumental Ex. 10) covering the two parcels of land conveyed to it by Milton Schwartz, and (2) a collateral assignment of the Genesco and A & P leases. (Monumental Ex. 11 and Genesco Ex. 6). The mortgage was dated June 3, 1972, and was recorded in the office of the Clerk of Court for Marlboro County on June 11, 1971, in Mortgage Book 117 at page 410. The collateral assignment of leases was dated June 3, 1971, and was recorded on June 11, 1971, in the office of the Clerk of Court for Marlboro County in Deed Book 123 at page 44. (Monumental Ex. 11).

20. At the time Monumental placed its mortgage on the property covered by the Genesco lease and obtained a collateral assignment of the Genesco lease in its favor, the roof of the building located on the property covered by the Genesco lease had been accepted by Genesco as constructed in accordance with the plans and specifications and the roof was watertight. (Monumental Ex. 5).

21. Monumental made the loan which is secured by the mortgage and the collateral assignment of the Genesco and A & P leases on the basis of two leases and the collateral assignments thereof. (Monumental Ex. 12, p. 3).

22. Hymil Realty Corp., by deed dated June 3, 1971, and recorded on June 22, 1971, in the office of the Clerk of Court for Marlboro County in Deed Book 123 at page 130, conveyed the two parcels of land described above back to Milton Schwartz, together with, all and singular, the rights, members, hereditaments and appurtenances thereto. (Genesco Ex. 7 and Monumental Ex. 15).

23. On August 3, 1971, Monumental notified Genesco and the Great Atlantic & Pacific Tea Company, Inc., of the collateral assignment of the two leases. Genesco acknowledged receipt of notice of the assignment on August 10, 1971. The collateral assignment was perfected with respect to both the Genesco lease and the A & P lease. (Monumental Exs. 16, 17).

24. Milton Schwartz again conveyed the two parcels of real estate described above together with, all and singular, the rights, members, hereditaments and appurtenances thereto to Hymil Realty Corp. by deed dated November 22, 1971, and recorded in the office of the Clerk of Court for Marlboro County on November 26, 1971 in Deed Book 124 at page 817. (Genesco Ex. 8 and Monumental Ex. 18).

25. Hymil Realty Corp. conveyed the two parcels of real estate described above together with, all and singular, the rights, members, hereditaments and appurtenances thereto back to Milton Schwartz by deed dated November 22, 1971, and recorded in the office of the Clerk of Court for Marlboro County on December 7, 1971, in Deed Book 124 at page 908. (Genesco Ex. 9 and Monumental Ex. 19).

26. Milton Schwartz conveyed the following described property to I.R.E., by deed dated January 2, 1974, and recorded in the office of the Clerk of Court for Marlboro County on January 14, 1974, in Deed Book 131 at page 93. (Genesco Ex. 10 and Monumental Ex. 20).

All that certain lot, piece or parcel of land, together with the buildings and improvements thereon, thence containing sixteen and 65/100 acres, situate, lying and being near the City of Bennettesville, in the County of Marlboro, State of South Carolina, and being bounded generally on the North by Route 15–401 (By-Pass); on the East by Carrollton Ave. and property of Carroll Estates; on the South by property of Carroll Estates and on the West by Breeden Street, said tract of land being more particularly described as follows:

Beginning at an old iron located at the southeastern corner of the intersection of Breeden Street adn Route 15–401 (By-Pass) and running thence North 60 degrees 50 minutes East a distance of 388.4

feet to an old iron, the point of tangency of the curve; thence North 58 degrees 46 minutes Eqst a distance of 228.6 feet to an iron; thence North 89 degrees 45 minutes East a distance of 757.2 feet along the southern right-of-way line of Carrollton Ave. to an iron; thence South 19 degrees 08 minutes East a distance of 311.4 feet to an iron; thence South 58 degrees 46 minutes West a distance of 1144.0 feet to an iron; thence North 35 degrees 52 minutes West a distance of 710.4 feet along the eastern right-of-way line of Breeden Street to an old iron; the point of beginning, all of which will appear by reference to a plat entitled "Plat of 16.65 Ac. Lot Property of H.W.C. Furman individually and as Trustee for David D. Carroll Et. Al." made August 12, 1969 by John M. Jackson, Jr., P.E. L.S., Bennettsville, S.C. and recorded in Plat Book 26 at page 16 in the Clerk of Court for Marlboro County, S.C.

together with, all and singular, the rights, members, hereditaments and appurtenances thereto. The property covered by the Genesco lease and the A & P lease is encompassed in the property conveyed by that deed. I.R.E. assumed the responsibility for paying the note held by Monumental.

27. By deed dated December 29, 1976, and recorded in the office of the Clerk of Court for Marlboro County on December 31, 1976, in Deed Book 140 at page 667, I.R.E. conveyed the following property to Benjamin D. Jaffe (Genesco Ex. 11 and Monumental Ex. 21):

All that certain lot, piece or parcel of land, together with the buildings and improvements thereon, situate and being near the City of Bennettesville, in the County of Marlboro, State of South Carolina, and being more particularly described as follows:

BEGINNING at an iron on the South side of Route 15 high point is 89.1 ft. S.W. of intersection with Carrollton Ave.; thence N. 58°—46' E. 62.3 ft. to an iron; thence N. 74°—15' E. 96.3 ft. to an iron; thence with Carrollton Ave. N. 89° 45' E. 192.4 ft. to an iron; thence S. 31°—14' E. 569.2 ft. to an iron; thence with Carroll-

ton Estates S. 58°—46 W. 350 ft. to an iron; thence N. 31°—14' W. 544 ft. to an iron; thence N. 58°—46' E. 30 ft. to iron; thence N. 31°—14' W. 150 ft. to beginning. All containing 5.16 acres and lying and being in Marlboro County, S.C.

together with, all and singular, the rights, members, hereditaments and appurtenances thereto. The property conveyed by that deed is the same property covered by Genesco and A & P leases and by the mortgage held by Monumental. Benjamin D. Jaffe took the property subject to the mortgage held by Monumental.

28. Benjamin D. Jaffe, by deed dated December 31, 1976, and recorded in the office of the Clerk of Court for Marlboro County on December 31, 1976, in Deed Book 140 at page 671, conveyed the same property he acquired from I.R.E. to Jaffe-Spindler, which also took the property subject to the mortgage held by Monumental. (Genesco Ex. 12 and Monumental Ex. 22).

29. Pursuant to the foregoing conveyances, Jaffe-Spindler became the owner of the property covered by the mortgage held by Monumental and became the lessor under the Genesco lease and the A & P lease, subject to the collateral assignment of those leases in favor of Monumental. The mortgage and the collateral assignment of the two leases stand as security for the payment of the mortgage note held by Monumental in the amount of Six Hundred Sixty Thousand ($660,000.00) Dollars on which there is presently due and owing as of June 1, 1983 the sum of $449,115.57. Interest is accruing on that amount at the rate of $107.60 per day. Jaffe-Spindler is the Owner-Lessor of the property covered by the Genesco lease.

30. (Genesco Ex. 1 and Monumental Ex. 1). The Genesco lease, provides, *inter alia:*

7. (b) . . . The Lessor shall, at its own expense, keep and maintain the entire building and basement, if any, watertight at all times.

17. (a) The Lessor after notice from the Lessee of the need therefor, shall make,

at the Lessor's expense, all repairs during the entire term of this Lease to the exterior walls, roof, canopies, foundations and structural parts and portions of the Leased Premises.

19. The Lessor covenants and represents that: . . . Lessee on paying the rent and performing Lessee's obligations in this Lease shall peacefully and quietly have, hold and enjoy the Leased Premises and the appurtenances throughout the Lease Term . . . .

31. The evidence demonstrates severe problems with the roof of the premises covered by the Genesco lease beginning in February of 1977. (Monumental Ex. 23).

32. The Kress director of buildings wrote complaining of roof leaks on February 24, 1977, saying there is "water over 25% of the sales floor resulting in ceiling tiles falling from the ceiling grid." (Genesco Ex. 40 and Monumental Ex. 23); on March 22, 1977, saying the "ceiling tiles are collapsing and we are suffering from merchadise damage each time it rains . . . the situation has become intolerable . . . ." (Genesco Ex. 42); on April 19, 1978, saying "yesterday the manager had nineteen (19) plastic swimming pools laid out on the floor to catch the drips coming from the ceiling." (Genesco Ex. 46); on June 25, 1980, saying a falling ceiling tile struck a female customer (Genesco Ex. 14); on October 2, 1980, saying "Presently we have fourteen (14) leaks in the store . . . ." (Genesco Ex. 18).

33. From 1977 through 1980 Jaffe-Spindler made numerous attempts to repair the roof, including substantial repairs of the roof in 1979 at a cost of some $5,880.00 (Genesco Exs. 30, 31 and 32). In addition, some interior water damage was repaired by Jaffe-Spindler (Genesco Ex. 33). However, the evidence clearly establishes that despite these repairs water continued to leak through the roof into the premises occupied by Genesco. On at least three different occasions in 1979 and 1980, Genesco threatened to withhold rents pursuant to the lease provisions to force Jaffe-Spindler to repair the roof. Notwithstanding

complaints communicated by Genesco to Jaffe-Spindler through phone calls and numerous letters, and notwithstanding several attempts by Jaffe-Spindler to repair the roof, the condition of the roof continued to deteriorate and substantially interfere with Genesco's retail operations to the end of 1980.

34. On or about December 31, 1980, as part of its decision to close its S.H. Kress and Company Division, Genesco closed the Kress store in Bennettsville. Genesco readily concedes that the closing of the Bennettsville store was for reasons other than the roof problems. (Exs. F–I to complaint CA # 82–496; Jaffe-Spindler Exs. 4, 5, and 6).

35. Pursuant to its lease (Genesco Ex. 1 and Monumental Ex. 1), Genesco has a right to the beneficial use and enjoyment of the premises separate and apart from its operation of a Kress Store. Genesco could have used the premises for some other purpose, and, equally important, Genesco has very broad rights to sublet the premises pursuant to Article 25 of the Genesco lease, which provides:

25. The Lessee may sublet all or any part of the Leased Premises or assign this lease or vacate the Leased Premises or permit the Leased Premises to remain vacant without the consent of the Lessor at any time after two (2) years from the Commencement Date; . . .

36. The evidence, taken as a whole, demonstrates that Genesco has been deprived of its beneficial use and enjoyment of the premises as a result of Jaffe-Spindler's failure to keep the premises watertight pursuant to its obligations under the terms of the Genesco lease. (¶s 7(b) and 17(a)).

37. Following Genesco's closing its retail S.H. Kress store in late 1980, representatives of Genesco and Jaffe-Spindler met at the site in February 1981 to inspect the building. At that time the building was securely locked and there was little or no evidence of any vandalism. The roof condition and resulting interior water damage was another matter. The inspection re-

vealed a lengthly split or rupture in the roof from one side of the building (200' × 150') to the other, with the roof deck clearly visible at numerous places along this lengthly split. The roofing membranes were blistered and/or ruptured over much of the roof, all of which allowed water to penetrate the roof and run in all directions along the roof deck before leaking in numerous places inside. An inspection of the interior revealed water on the floors, fallen ceiling tiles, loose floor tiles and electrical fixtures dangling from the ceiling. In its then existing condition, the building was untenable.

38. In an effort to repair the roof and restore the building to a watertight condition, Jaffe-Spindler again engaged Mr. Charles Clark to make certain repairs to the roof (Genesco Ex. 34) at a cost of $770. In making the February 1981 repairs, Mr. Clark found a 90' split in the roof, about 4' over from the split he had found and repaired in 1979. His recommendation that an expansion joint be installed, an expensive procedure, was not accepted and Mr. Clark proceeded to patch the roof. From the outset, Mr. Clark recommended a new roof as the solution to the problem, only to be advised by Jaffe-Spindler that "money was tight" and it wanted to get by for a while without the expense of a new roof.

39. These repairs to the roof by Mr. Clark in February 1981 were the last repairs made to the roof. By its letter of March 12, 1981 (Genesco Ex. 22), Genesco advised Jaffe-Spindler "... if the leak reoccurs, we shall abandon and surrender the premises and cease paying rent permanently."

40. Despite recurring and continuing problems with the roof which rendered the premises untenable, Genesco continued to pay rent under the lease with Jaffe-Spindler through September 1981. Thereafter, lease payments have been made by Genesco to either Jaffe-Spindler or Monumental for the period October 1981 through June 1983, pursuant to and in accordance with this court's order of March 31, 1982, specifically reserving unto Genesco the right to recoup all monthly lease payments applicable to the period commencing October 1, 1981 if Genesco was found to have been constructively evicted from the premises at or prior to October 1, 1981.

41. The February 1981 repairs to the roof by Mr. Clark were once again ineffective for producing a watertight building. For purposes of satisfying itself as to the roof condition and possible measures to correct the situation, Genesco retained CRS, Inc. to make an inspection of the roof and report its findings and recommendations. In his report of July 22, 1981 (Genesco Ex. 58), Mr. Baxter, President of CRS, Inc., observed:

In its present condition, the existing roofing assembly could never be effectively repaired and maintain a watertight condition. The blistering is much to [sic] extensive and there is far too much water between the original roofing membrane and the overlay membrane to make repairs possible.

\* \* \* \* \* \*

It is my opinion that the existing roofing assembly should be removed to the steel deck, the deck be repaired/replaced as required and a new insulated roofing assembly installed. The total roof area on this store approximates 38,000 SF. An appropriate budget to remove and properly replace the roofing assembly in compliance with applicable insurance and energy codes would be $100,000.00. This number would allow for correction of deficencies [sic] which now exist in the roof accessories and perimeter waterproofing.

42. It was also Mr. Baxter's opinion that due to the condition of the roof, the building was untenable in July of 1981. The $100,000 estimate for replacing the roof as recommended by CRS, Inc. would also approximate today's current cost for this work as detailed in the CRS Report.

43. As previously noted, following the February 1981 roof repairs by Mr. Clark, no further efforts were made by Jaffe-Spindler to repair the roof. At pp. 63 and

64 of his deposition (Genesco Ex. 59), Mr. Joseph Jaffe said:

Q. Let me show you a document, dated June 21, 1982, from Mr. R.W. Dibble to Mr. Joseph H. Jaffe and ask you whether you have seen a copy of that document prior to today.

A. Yes, sir.

Q. In there Mr. Dibble states: "On a recent inspection by Mr. Hopkins, who is employed by Monumental Life, Monumental confirmed the fact that there is a serious problem regardng the roof." Do you see that statement?

A. Yes. Yes, sir.

Q. All right. Did Jaffe-Spindler take any action to determine whether there is or is not a serious problem with the roof?

A. We presented this letter to counsel.

Q. Yes.

A. And upon his advice, have taken no action at this point.

44. While the building was still secured in July 1981, although untenable, by September or October 1981 vandals had discovered to their inexplicable delight the vacant building with its enticing glass front. By this time considerable vandalism had occurred, the glass had been broken, there was trash in the building and other evidences that vandals had been inside. Upon discovering this, Genesco boarded up the front of the building and securely locked all entrances into the building. Subsequent inspections were made by Genesco in March and midsummer of 1982 to determine either if the roof had been repaired or if the building was still secured.

45. In its awareness of the continuing roof problems, Jaffe-Spindler secured proposals from various sources for correction of the situation and restoration of the building to a watertight condition (Genesco Exs. 24, 25, 26 and 27). Despite this awareness on the part of Jaffe-Spindler, no further repairs were authorized following the February 1981 repairs by Mr. Clark.

46. Although not necessary as a matter of law, Genesco introduced evidence of its efforts to sublet the premises, including discussions concerning subletting with the following persons and entities:

| | |
|---|---|
| Andrew Quartermain Corporation | Thomas Tayler |
| 627 West Innes Street | Cheraw, SC 29520 |
| Salisbury, NC 28144 | |
| | |
| Vernon J. Daniel | George McIntire |
| Hanes Hosiery | S.C. Dept. of Rehabilitation |
| Winston-Salem, NC 27102 | Bennettsville, SC 29512 |

Genesco has been unable to beneficially use on its own behalf or to sublet the premises as a result of Jaffe-Spindler's failure to repair the roof. The roof problems were acute and it was a major factor in the inability of Genesco to sublet the premises.

47. Jaffe-Spindler failed to make the monthly payments of principal and interest to Monumental beginning with the payment due on August 1, 1982. (Monumental Exs. 24 and 25). Monumental notified Jaffe-Spindler that it is in default under the mortgage and has notified Genesco of the default on the part of Jaffe-Spindler and demanded, pursuant to the terms of the collateral assignment, that Genesco pay the monthly rent directly to Monumental. Genesco has done so commencing with the rental payment due on October 1, 1982. All funds received by Monumental from Genesco and A & P have been timely applied to the debt.

48. By the order of March 31, 1982, this court determined that the Genesco lease would be terminated retroactively as of October 1, 1981, if Genesco prevails on its theory of constructive eviction. The Genesco lease had an initial term of 300 months beginning August 12, 1970. As of October 1, 1981, there remained 168 months of the initial lease term. The monthly lease payment is $5,729.00, and the present value of the monthly payments due on and after October 1, 1981, using a 13% discount factor is $442,317.00.

49. In addition to the collateral assignment of the Genesco lease, Monumental holds a mortgage on the land and building owned by Jaffe-Spindler covered by both the Genesco lease and the A & P lease. To the extent any waste committed by Jaffe-

Spindler has diminished the value of the building, Monumental is further entitled to recover an amount equal to the diminution in value.

50. A detailed estimate of repairs necessary to restore the premises (exterior and interior) to a suitable condition was obtained from Powers Construction Co., Inc. (Monumental Ex. 26). Similar estimates were obtained by Jaffe-Spindler from C & H Roofing and All-Brite Construction Co. (Jaffe-Spindler Ex. 9). The Powers Construction Company estimate amounted to $99,829.60 as compared to the estimate of $72,233 submitted by All-Brite Construction Co. The C & H Roofing estimate for repairing the roof amounted to $48,000 as compared to the estimate of $100,000 submitted by CRS, Inc. (Genesco Ex. 58). The estimates previously submitted by C & H Roofing ($48,000) and All-Brite Construction Co. ($72,233) were revised upward by the testimony to $65,000 and $99,000 respectively. In reviewing the estimates, the court concludes that the $100,000 estimate in the Report of CRS, Inc. is more reliable and credible then the similar $65,000 estimate submitted and testified to by Mr. Ritter of C & H Roofing. This is due to the expertise of Mr. Baxter of CRS, Inc. and the basic differences in the procedures recommended for replacing/restoring the roof.

51. Accepting the appraisal report of MAI appraiser Robert M. Christopher (Monumental Ex. 29) as more appropriate to the issues in dispute and therefore more credible, the value of the S.H. Kress building has been reduced by the cost to repair the damage resulting from the leaking roof and from vandalism. The cost to repair the water damage is $95,475. The cost to repair the damage from vandalism is $4,353. The cost to repair the roof is $100,000. Thus, the total cost to restore the property to its condition at the time it was acquired by Jaffe-Spindler is $199,828, and the value of the building has been diminished by this amount.

## CONCLUSIONS OF LAW

A. To the extent that any Findings of Fact are deemed Conclusions of Law, they are incorporated herein.

B. This court has jurisdiction over the parties and the subject matter of this action in that it is a civil action wherein the amount in controversy exceeds the sum of $10,000 exclusive of interest and costs, and there is complete diversity of citizenship between the parties. 28 U.S.C. § 1332.

C. The law applicable to this proceeding is the substantive law of the State of South Carolina. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

D. Termination of a lease on the theory of constructive eviction is a harsh remedy and each particular case must be carefully examined within its factual context as applied to the underlying principles of law. In order to establish a constructive eviction, it is only necessary to show that the acts or omissions of Jaffe-Spindler substantially interfered with the beneficial use or enjoyment of the premises by Genesco and that Genesco abandoned the premises within a reasonable time. *Thomas v. Hancock,* 271 S.C. 273, 246 S.E.2d 604 (1978).

E. The breach by Jaffe-Spindler of the covenant in the Lease requiring it to maintain the roof in a watertight condition is an act or omission which constitutes a constructive eviction of Genesco. *Sewell v. Hukill,* 138 Mont. 242, 356 P.2d 39 (1960); *Rea v. Algren,* 104 Minn. 316, 116 N.W. 580 (1908); 49 Am.Jur.2d *Landlord and Tenant* § 316; and 52 C.J.S. *Landlord and Tenant* § 458.

F. It is not necessary that Jaffe-Spindler specifically intended that its acts or omissions have the result of evicting Genesco because intent is implied from the character of Jaffe-Spindler's actions. *Scott v. Prazma,* 555 P.2d 571 (Wyo., 1976); *Ackerhalt v. Smith,* 141 A.2d 187 (Mun.Ct. App.Dist.Col.1958); 49 Am.Jur.2d *Landlord and Tenant* § 302; and 52 C.J.S. *Landlord and Tenant* § 456.

84

■ G. Genesco acted reasonably by allowing Jaffe-Spindler several opportunities to make repairs to the roof and Genesco's abandonment of the premises in September of 1981 was an abandonment within a reasonable time. *Reste Realty Corporation v. Cooper*, 53 N.J. 444, 251 A.2d 268 (1968); *Cox v. Hardy*, 371 S.W.2d 945 (Ky.1963); *Laffey v. Woodhull*, 256 Ill.App. 325 (1930); 49 Am.Jur.2d *Landlord and Tenant* § 304; and 52 C.J.S. *Landlord and Tenant* § 459.

■ H. Genesco, having been constructively evicted from the premises, is no longer obligated to pay rent and can consider the Genesco lease terminated retroactively as of September 30, 1981. *Automobile Supply Co. v. Scene-in-Action Corp.*, 340 Ill. 196, 172 N.E. 35 (1930); *Scott v. Prazma, supra;* *Ackerhalt v. Smith, supra;* and 49 Am.Jur.2d *Landlord and Tenant* § 576.

■ I. Monumental has cross-claimed against Jaffe-Spindler for waste. Monumental seeks damages for impairment of the value of the security held by Monumental caused by Jaffe-Spindler's failure and refusal to maintain a watertight roof on the building leased to Genesco.

J. Waste is a tort defined as the "destruction, misuse, alteration or neglect of premises by one lawfully in possession thereof to the prejudice of the estate or interest therein of another." *Jowdy v. Guerin*, 10 Ariz.App. 205, 457 P.2d 745, 748 (1969) (quoting 56 Am.Jur. *Waste* § 2). *See also, Delano v. Smith*, 206 Mass. 365, 92 N.E. 500 (1910). "The failure of a tenant or mortgagor to exercise the ordinary care of a prudent man for the preservation and protection of the estate is permissive waste." *Jowdy, supra* at 748 (quoting 56 Am.Jur. *Waste* § 4). Three elements must be proved to establish a cause of action for waste: (i) an act constituting waste; (2) done by one legally in possession of the property; and, (3) prejudicial to the estate or interest of another in the property. *Jowdy, supra.*

■ K. South Carolina recognizes a cause of action for waste by a mortgagee against a mortgagor. *Heath v. Haile*, 45 S.C. 642, 24 S.E. 300 (1896); *Planters Bank v. Lummus Cotton Gin Co.*, 132 S.C. 16, 128 S.E. 876 (1925). In both cases the action for waste was brought after foreclosure and sale of the mortgaged property. There has been no decision in South Carolina involving an action for waste brought prior to default on a mortgage or prior to the commencement of a foreclosure action. However, it is the majority view in the United States that a mortgagee may maintain an action for waste prior to a default in the mortgage covenants or the commencement of a foreclosure action. *See e.g., Hummer v. R.C. Huffman Const. Co.*, 63 F.2d 372 (7th Cir. 1933); *Garliner v. Glicken*, 23 Misc. 170, 196 N.Y.S.2d 784 (1960); *W.R. Inv. Co. v. Edwards Supply Co.*, 304 Mass. 650, 24 N.E.2d 518 (1939); *Syracuse Sav. Bank v. Onondaga Silk Co., Inc.*, 171 Misc. 993, 14 N.Y.S.2d 356 (1939); *Delano v. Smith*, 206 Mass. 365, 92 N.E. 500 (1910); *Arnold v. Broad*, 15 Colo.App. 389, 62 P. 577 (1900). This is true whether the mortgagee has fee title to, or merely a lien upon, the mortgaged premises because "a mortgage is everywhere considered as passing the title to land, so far as may be necessary for the protection of the mortgagee, and to give him the full benefit of his security." *Waterman v. Mackenzie*, 138 U.S. 252, 11 S.Ct. 334, 31 L.Ed. 923 (1891). *See also, Arnold v. Broad, supra;* *Hummer v. R.C. Huffman Const. Co., supra;* *Delano v. Smith, supra;* *W.R. Inv. Co. v. Edwards Supply Co.*, and *Hubinger v. Central Trust Co. of N.Y.*, 94 F. 788 (8th Cir.1899). The difficulty of ascertaining damages in the absence of a sale of the property is not a bar to an action for waste prior to a foreclosure action. *Arnold v. Broad, supra;* *Syracuse Sav. Bank v. Onondaga Silk Co. Inc., supra.* This is particularly true when the amount of waste exceeds the amount of the debt.

■ L. Where there is no legislative or judicial pronouncement on a question of state law, a federal court under *Erie* must respond to the novel question as it believes

the state judiciary would under the identical circumstances using the state decision making processes. *Hatfield v. Palles,* 537 F.2d 1245 (4th Cir.1976); *Smith v. Regina Mfg. Co.,* 396 F.2d 826 (4th Cir.1968); *R.L. Mooney v. Fibreboard Corporation,* 485 F.Supp. 242 (E.D.Tex.1980); *Gattis v. Chavez,* 413 F.Supp. 33 (D.S.C.1976); *Louthian v. State Farm Mut. Ins. Co.,* 357 F.Supp. 894 (D.S.C.1973).

 M. This court is of the opinion that, if faced with the facts and circumstances presented by this case, the South Carolina Supreme Court would follow the majority rule in this country with respect to the maintenance of an action for waste by a mortgagee prior to bringing a foreclosure action. This is particularly so in view of the fact that Jaffe-Spindler, the mortgagor, is in default because of nonpayment of principal and interest since August 1, 1982, which was the exact situation in *Hummer, supra,* and because Monumental has exercised its rights under the collateral assignment of leases. This conclusion is further buttressed by the fact that the debt owed to Monumental is non-recourse as to Jaffe-Spindler. Where the mortgagee may look only to the security for repayment, it is particularly equitable to allow an action for waste to be maintained. Therefore, the court concludes that Monumental, which holds a mortgage on real estate and a collateral assignment of two leases as security for the payment of its mortgage note, may maintain its cross-claim against Jaffe-Spindler for waste. The cross-claim falls within this court's ancillary and pendent jurisdiction. *Fulton Nat. Bank of Atlanta v. Hozier,* 267 U.S. 276, 45 S.Ct. 261, 69 L.Ed. 609 (1925).

 N. The mortgagee must prove the elements of its cause of action, to wit: Impairment of the value of its security by the act of a person legally in possession of the property and the amount of the impairment. *Hubinger v. Central Trust Co. of N.Y., supra;* and *Arnold v. Broad, supra.* The court concludes that Jaffe-Spindler is legally in possession of the property covered by the Genesco lease by virtue of its

acquisition of that property and by virtue of its position as lessor under the Genesco lease. The court further concludes that the value of the security held by Monumental has been impaired. The market value of the building leased to Genesco has been diminished by an amount equal to the cost to restore the roof to a watertight condition and the cost of repairing the damage to the interior of the store caused by the roof not being watertight and by vandalism. Jaffe-Spindler has failed to keep the roof watertight as it is obligated to do under the Genesco lease. Its failure to do so after repeated notice from Genesco and notice from Monumental constitutes permissive waste. That waste is the direct cause of the physical damage to the building.

 O. The cancellation of a lease assigned as security for the payment of a debt constitutes waste. *Cf., Metropolitan Life Ins. Co. v. W.T. Grant Co.,* 321 Ill. App. 487, 53 N.E.2d 255 (1944). The permissive waste committed by Jaffe-Spindler directly caused the constructive eviction of Genesco from the property covered by the Genesco lease and allowed Genesco to terminate that lease, which this court finds it has the right to do at September 30, 1981. That lease was assigned to Monumental as collateral security for the payment of the mortgage note held by Monumental. That collateral assignment has now become absolute by virtue of the default in payment of principal and interest by Jaffe-Spindler and the exercise by Monumental of its rights under the collateral assignment.

P. The termination of the Genesco lease is an impairment and diminution in value of Monumental's security. The present value of the Genesco lease from October 1, 1981, the date of termination, using a thirteen percent discount factor, is $442,317.00. The value of the lease as terminated is zero. Therefore, *this* security held by Monumental has been reduced in value by $442,317.00.

 Q. The expenses of operating and maintaining the building are not deductible from the income stream in calculating the

present value. The responsibility for taxes, insurance and maintenance remains with the landlord, Jaffe-Spindler. The assignment to Monumental of the lease as security for the debt is simply an assignment of the income stream, and does not put Monumental in the position of landlord with its attendant responsibilities and expenses.

It is generally recognized that where a lessor has actually, in terms, assigned his lease or his interest under the lease, with no indication as to what was intended to pass, the most reasonable rule is, and most courts have held, that unaccrued rents pass, together with such covenants as are designed for the collection thereof, but all covenants designed for the protection of the reversion, with the reversion itself, remain in the assignor.

49 Am.Jur.2d *Landlord and Tenant* § 98. This is in accord with the generally held view that "an assignment for security transfers the rights but not the obligations inherent in the assigned contract." *Black v. Sullivan,* 48 Cal.App.3d 557, 122 Cal. Rptr. 119, 124 (1975).

R. Thus, in the present case, although expenses of approximately $11,100 per year are attributable to the landlord under the lease, these expenses are not chargeable to Monumental as assignee of the income stream. Because of the termination of the Genesco lease, Monumental has been deprived of the present value of the gross income stream from the lease.

■ S. In addition to the loss of the present value of the Genesco lease, the value of Monumental's security interest in the building leased to Genesco has been reduced by the cost to restore the premises to the same condition as when Jaffe-Spindler acquired the property. As found above this amount is $199,828.

■ T. There are two measures of damages for waste: (1) the cost to restore and (2) the decrease in market value. *Jowdy v. Guerin, supra; Heath v. Haile, supra;* and *Planters Bank v. Lummus Cotton Gin Co., supra.* Monumental has used both methods in proving the reduction in

value of its security. The cost to restore is represented by the cost to replace the roof and to repair the interior damage. The decrease or marked value is equal to that amount and is also equal to the loss of the present value of the income stream from the Genesco lease.

■ U. Any damages recovered by Monumental for waste on the part of Jaffe-Spindler must be applied toward the debt. *W.R. Inv. Co. v. Edwards Supply Co., supra;* and the damages recoverable are limited to the amount of the debt remaining due. *Brayton v. Pappas,* 52 A.D.2d 187, 383 N.Y.S.2d 723 (1976), *Syracuse Sav. Bank v. Onondaga Silk Co. Inc., supra;* and *Planters Bank v. Lummus Cotton Gin Co., supra.* Jaffe-Spindler is liable although it did not assume the mortgage held by Monumental, *Jowdy v. Guerin, supra,* and although it is solvent, *City of Toledo v. Brown,* 130 Ohio St. 513, 200 N.E. 750 (1936); *Hummer v. R.C. Huffman Const. Co., supra.* Likewise, the value of the remaining security for the debt is immaterial, as the mortgagee is entitled to its security. *Delano v. Smith, supra.*

V. The total impairment to the value of the security held by Monumental is $642,145.00. The amount remaining on the note held by Monumental as of June 1, 1983 is $449,115.57. Therefore Monumental is entitled to judgment against Jaffe-Spindler in the amount of $449,115.57 plus interest from June 1, 1983, to the date of entry of judgment at the rate of $107.60 per day.

■ W. In connection with the cross-complaint of Monumental Life Insurance Corporation against Jaffe-Spindler Company, Jaffe-Spindler alleges as a Second Defense that the cross-complaint is barred because of Monumental's "bad faith conduct, acquiescence, and release" arising from the failure of Monumental to agree to a proposed settlement among the parties. Of course, no party to a pending lawsuit is required to settle its claims or compromise its positions. Evidence of settlement discussions may not even be introduced. No prejudice can arise from the failure of a

party to enter into a settlement proposed by an adversary. The position taken by Jaffe-Spindler in this regard is totally without foundation and flies in the face of well settled legal principles. The Second Defense necessarily fails as a result.

X. For its Fifth Defense to Monumental's cross-complaint, Jaffe-Spindler asserts that Monumental has failed to mitigate its damages. While a party is charged with a general duty to mitigate, this doctrine can have no application under the facts of this case. The damages sought to be recovered by Monumental are commensurate with the diminution in value of the security given for the debt owing to Monumental. Such damages cannot be mitigated because Monumental does not control either the property itself or the Genesco lease. Monumental is not required to repair the roof. That is the exclusive responsibility of Jaffe-Spindler as owner of the property. Monumental cannot control the actions of Genesco in connection with the lease. If the lease is terminated as a result of Jaffe-Spindler's conduct, Monumental cannot be made to bear the loss. Accordingly, Jaffe-Spindler's Fifth Defense to the cross-complaint must also fail.

Y. As a Sixth Defense, Jaffe-Spindler alleges that Monumental either knew or should have known that the original roof on the building was defective and should be barred from recovering against Jaffe-Spindler as a result. Of course the original construction of the roof is not at issue in this litigation. The contractor is not a party. Jaffe-Spindler has not heretofore plead or otherwise asserted as an excuse to its own liability the negligence or breach of contract of any third party. The issue raised by both Genesco and Monumental is the failure of Jaffe-Spindler to maintain the premises. The condition of the roof at the time it was constructed, even if it was defective, does not excuse Jaffe-Spindler's responsibility to its tenant and the mortgagee. Jaffe-Spindler may ultimately bring an action against the contractor or the person from whom it bought the property to mitigate its loss, but that is not before me.

Similarly, Jaffe-Spindler alleges in its Seventh Defense that the roof was to carry a twenty-year bond, and that if such bond does not exist, Monumental should be barred from its cross-complaint. The same reasoning applies to this contention. The presence or absence of the bond cannot affect Jaffe-Spindler's responsibilities to Genesco and Monumental. This Defense must also fail.

Based on the foregoing Findings of Fact and Conclusions of Law, it is ORDERED:

1. The Genesco lease is terminated *nunc pro tunc* as of September 30, 1981. Genesco shall have judgment against Jaffe-Spindler in the amount of $120,309.00.

2. Genesco shall have no further liability or responsibility to Jaffe-Spindler or Monumental under the lease, having been constructively evicted by Jaffe-Spindler and the lease terminated at September 30, 1981.

3. Monumental shall have judgment against Jaffe-Spindler Company in the amount of $449,115.57 plus interest from June 1, 1983, to the date of entry of judgment at the rate of $107.60 per day. All funds received by Monumental pursuant to this Order or the judgment shall be applied to the debt owed to Monumental in accordance with the terms of the mortgage note.

4. All claims and counterclaims of Jaffe-Spindler Company are dismissed with prejudice.

IT IS SO ORDERED.