**SOUTHERN MOTORS, INC., Plaintiff,**

v.

**VIRGINIA NATIONAL BANK, et al., Defendants.**

**BANK OF VIRGINIA, Plaintiff,**

v.

**SOUTHERN MOTORS, INC., et al., Defendants.**

**Civ. A. Nos. 85–0326–A, 85–0327–A.**

United States District Court, W.D. Virginia, Abingdon Division.

Feb. 10, 1987.

Robert T. Copeland, Abingdon, Va., for plaintiff in No. 85–0326A.

George M. Warren, Jr., Bristol, Va., Stuart B. Campbell, Jr., Wytheville, Va., for defendants in No. 85–0326A.

Fred M. Leonard, Bristol, Tenn., and Robert E. Wick, Jr., Bristol, Va., for plaintiff in No. 85–0327A.

Robert T. Copeland, Abingdon, Va., George M. Warren, Jr., Bristol, Va., Stuart B. Campbell, Jr., Wytheville, Va., for defendants in No. 85–0327A.

## MEMORANDUM OPINION

KISER, District Judge.

On March 5, 1981, Perry C. Cartwright, Sr., Frances M. Cartwright, and Southern Motors, Inc. leased an automobile dealership facility located near Bristol, Virginia, to Mullins Motors, Inc. The 10–year lease provided that repairs to the septic system were the responsibility of the landlord. The tenant vacated the facility on July 9, 1982, because of recurring problems with the septic system. The landlord claims that the tenant breached the lease agreement by leaving the premises and seeks, among other things, rental payments of approximately $8,000 a month from the date of the alleged breach to September, 1983, when the Bank of Virginia foreclosed its deeds of trust on the property. The tenant defends by claiming it was constructively evicted as a result of difficulties with the septic system.

The Cartwrights and Southern Motors, Inc. filed for bankruptcy under Chapter 11 of the Bankruptcy Code on January 15, 1982. The Bankruptcy Court heard their claim for rent and found that the tenant was constructively evicted from the property and owed no rental payments after July 9, 1982. This case is being reviewed under the standing order in effect prior to the adoption of the 1984 amendments to the Bankruptcy Code, so the record will be reviewed *de novo*.

The Bankruptcy Court found, and the record shows, that problems with the septic system caused sewage to back up and overflow in the restrooms, at times running into the public area of the service department, the customers' lounge, and the showroom. The restrooms sometimes were out of service for two or three days at a time. Customers and employees were forced to use restroom facilities at a nearby restaurant. Two of the tenant's maintenance employees were required to clean the premises, which included scrubbing with deodorant soap and vacuuming carpets.

Mullins Motors began to experience problems with the septic system shortly after it moved into the premises on March 14, 1981.[1] In April of that year, Mullins Motors employed a septic company to pump several truckloads of sewage from the system. In May, Cartwright hired a contractor to install an extension to the system and new field lines, but problems resumed that summer. Cartwright said he was noti-

fied that the problems continued. In January of 1982, the manager of Mullins Motors notified Cartwright by telephone and letter that septic-system problems were recurring. Again in April, Cartwright was notified of the continuing problems by letter from the president of Mullins Motors. The tenant had the system pumped several times during this period. On July 9, Mullins Motors vacated the premises and notified Cartwright by letter. There was testimony that problems with the septic system became worse toward the latter part of tenant's occupancy.

■ The Virginia Supreme Court, in the only opinion it has issued on the subject of constructive eviction in this context,[2] found that where the landlord failed to provide adequate heat and light as required by the lease, the tenant was constructively evicted and excused from paying rent. *Buchanan v. Orange*, 118 Va. 511, 88 S.E. 52 (1916). Eviction can include any wrongful act of the landlord, either commission or omission, which may result in substantial interference with the tenant's possession or enjoyment. *Id.* at 53, citing Taylor on Landlord and Tenant (9th Ed.) § 309A.

The serious problems with the septic system in this case certainly rise to the level of substantial interference with the tenant's use of the premises. The landlord was required by the lease to repair the system. Except for the extension added to the system in May of 1981, the landlord wholly failed to perform its obligation un-

---

1. Trial testimony showed that the septic system was located in a low-lying area with poor soil absorption. Problems with the system were most likely to occur during rainy weather. Cartwright testified that these problems had existed prior to the lease with Mullins Motors. J.R. Mullins, President of Mullins Motors, stated that he was not aware of the problems when the lease was signed.

2. There are a few Virginia cases that use constructive eviction in other ways. In *Briggs v. Hall*, 4 Leigh (31 Va.) 484, 488–89 (1833), for example, the Virginia Supreme Court stated that a tenant who leased a farm for one year was evicted and excused from paying the entire rent because the landlord wrongfully harvested four acres of hay on the farm. The eviction was found even though the tenant remained on the farm for the entire year.

How can the landlord complain of the law which says to him, 'be just, and abide by your contract; if you take from your tenant a part of the premises, you shall receive no rent?' But look at the other side: a man rents a tract of land; it is of a size which suits his capital and his views; he would not rent a part of it; it would be too small; but after he has settled upon it, and made all his arrangements for a crop, his landlord comes and takes forcible possession of his best fields: he must either at an inclement or inconvenient season, turn himself out of house and home; or if he remains, you make him pay to this oppressive landlord, a portion of the rent. It is not consistent either with the policy or humanity of the law, thus to arm the strong against the weak.

*Id.* at 489.

der the lease. An automobile dealership cannot properly carry on its business with closed restrooms and the odor and filth that accompanied each backup of the septic system. As indicated by one of the tenant's witnesses at trial, this recurring problem was an embarrassment both to Mullins Motors and its customers.

The two principal arguments made by the landlord are that Mullins Motors waived its right to claim constructive eviction by remaining at the premises for more than a year, and that the landlord was not given adequate notice of the septic-system problems.

It generally is held that to claim constructive eviction, a tenant must vacate the premises within a reasonable time. *See, e.g., Jaffe-Spindler Co. v. Genesco, Inc.,* 747 F.2d 253, 256 n. 2 (4th Cir.1984).[3]

In *Jaffe-Spindler,* the Fourth Circuit affirmed a finding by the District Court in *Genesco, Inc. v. Monumental Life Ins. Co.,* 577 F.Supp. 72 (D.S.C.1983), that the tenant was constructively evicted more than four years after it began to experience severe problems caused by major leaks in the roof of a department store.[4]

Even if a tenant waived its right to claim constructive eviction by failing to vacate the premises promptly, some courts have held that the right arises again once the problem recurs.

In the case of *In Re Consumers World,* 160 F.Supp. 238 (D.Mass.1958), the court found that the tenant was constructively evicted because the landlord violated a lease provision preventing it from engaging in a competing business. The violations continued for almost a year and a half before the tenant took steps to vacate the premises. The court held that even if the tenant had waived the right to claim constructive eviction based on earlier violations, the increase in competing business toward the latter part of the tenancy

amounted to a new violation that provided a new basis for abandonment. *Id.* at 241.

In *Automobile Supply Co. v. Scene-in-Action Corp.,* 340 Ill. 196, 172 N.E. 35 (Ill.1930), the tenant continued to occupy the premises after the landlord failed to provide sufficient heat. The court said this waived the tenant's right to terminate the lease, but this waiver would not have prevented the tenant from vacating the property based on subsequent breaches of the landlord's duty to provide adequate heat. *Id.,* 172 N.E. at 38.

In *Batterman v. Levenson,* 102 Misc. 92, 168 N.Y.S. 197 (1917), the tenant abandoned his dental offices one year and two months after entering into the lease because the offices were infested with rats. Even though the tenant knew of the condition prior to signing the lease, the tenant can claim constructive eviction because the infestation became worse during the latter months of the tenancy. *Id.,* 168 N.Y.S. at 198.

Other cases hold that when the landlord's breach is of a recurring nature, a jury question is presented as to whether the tenant acted reasonably by remaining on the premises after the first breach occurred. *See, e.g., Minneapolis Co-operative Co. v. Williamson,* 51 Minn. 53, 52 N.W. 986, 987 (Minn.1892), and *Kennedy v. Nelson,* 76 N.M. 299, 414 P.2d 518, 521 (1966).

■■■ I find that it was reasonable for Mullins Motors to remain on the leased premises for slightly more than a year before exercising its right to claim constructive eviction. Certainly this is a far shorter period than the 4½ years held to be reasonable in *Genesco* and affirmed by the Fourth Circuit on facts similar to those here. Even if the tenant's delay in vacating the premises could be deemed unreasonable, I believe that the recurring nature of the problem allowed Mullins Motors to

---

**3.** The Virginia Supreme Court has not had occasion to address the question of what constitutes a reasonable time.

**4.** The problems continued throughout the entire period. The landlord made numerous repair

attempts, but was not willing to spend the money necessary to replace the roof as had been recommended. No more repairs were attempted during the last seven months of the tenancy.

claim that it was constructively evicted because of septic-system backups that occurred during the latter part of the tenancy.

In *Rome v. Johnson*, 274 Mass. 444, 174 N.E. 716 (1931), the court discusses factors that may be considered in determining whether a tenant unreasonably delayed its decision to vacate the premises:

> What is a reasonable time depends upon the circumstances of each case including the size of the leased premises, the purposes for which they are occupied by the tenant, the personal property and fixtures owned by the tenant, the place where they are located, and the time reasonably required to remove them, with known weather conditions in New England and the difficulty of securing another location suitable for the conduct of the defendant's business.

*Id.*, 174 N.E. at 719.

It should be apparent that relocating a fairly large automobile dealership facility and service department would entail considerable difficulty. Many of the factors discussed in *Rome* certainly apply to the dilemma faced by Mullins Motors.

The other argument advanced by the landlord—that the tenant did not give the landlord adequate notice of the problem—is without merit. Perry Cartwright knew, without question, that the septic system was inadequate and caused serious problems. He knew of the situation before the lease was signed; the tenant was yet to become aware of it.

Cartwright attempted, at the tenant's insistence, to correct the problem by having an extension added to the system during the early part of the tenancy. He testified that he was later informed by the tenant that this did not solve the matter. The tenant also mailed a couple of letters in early 1982 and telephoned Cartwright concerning continued problems. Cartwright denies that he received the letters or the phone call.

■ Proof that mail was properly addressed, stamped, and deposited with the Postal Service has long been accepted as evidence of delivery to the addressee.[5] *Legille v. Dann*, 544 F.2d 1, 4–5 (D.C.Cir. 1976). Innumerable cases recognize a presumption to that effect. *Id.* at 5. If the addressee offers evidence to the contrary sufficient to satisfy the judge's requirement of some evidence, the presumption disappears and the matter becomes a question of fact. *Id.* at 5–6. In *Arkansas Motor Coaches v. Commissioner of Int. Rev.*, 198 F.2d 189 (8th Cir.1952), the court stated that while the presumption of receipt is rebuttable, it is a very strong presumption and can be rebutted only by specific facts. *Id.* at 191.

■ Cartwright's mere denial of receipt of the 1982 letters, particularly in light of his poor memory,[6] is not sufficient to rebut the presumption that the letters were delivered to him.[7]

■ In any event, the letters could do no more than tell Cartwright what he already

---

5. These foundational facts were not put into the record as to the January letter. But the landlord offered the letter into evidence without limitation on its purpose and without objecting to its authenticity. Thus it is to be viewed as being what it purports to be: a business letter that was mailed to the addressee.

The secretary who typed the April letter testified that she is certain it was mailed by her, as was her custom with all the letters she typed. She could not specifically recall mailing that particular letter, but that is understandable because she was first questioned about it two years after the letter was written. I believe her testimony is sufficient to establish the foundation necessary to raise a presumption of receipt by the addressee.

6. The record shows that Cartwright was sometimes confused and could not recall whether he had received or seen various letters and documents involved in this case, including letters from attorneys for the Bank of Virginia and from his own attorney.

7. The landlord challenges the authenticity of the April letter because it was not produced by the tenant until the time of trial. The tenant's explanation—that the letter was accidentally placed in the file of another Cartwright, who is the brother-in-law of J.R. Mullins—seems logical. I consider the letter genuine.

knew.[8]  Cartwright knew that the septic system was inadequate.  He knew the problem it created.  He knew that he had a duty under the lease to make necessary repairs to the system, yet he did nothing.

■ Cartwright's duty was in no way lessened by the fact that the tenant periodically had the system pumped, used its own employees to clean up the mess, and deducted the cost from its rental payments. The tenant's actions were simply a stopgap measure; they were not repairs to the system.  The duty to make repairs was on the landlord.  That duty was breached.

■ Mullins Motors was constructively evicted from the premises as of July 9, 1982, and all of its obligations under the lease were terminated on that date.[9]

Also to be decided in this case is whether J.R. Mullins is entitled under 11 U.S.C. § 553 (1979) to offset the debts he owes to Cartwright and to Southern Motors for the purchase of its assets against the amount that Cartwright owes Mullins for paying their joint promissory note given to Citizens Fidelity Bank.  The Bankruptcy Court's proposed findings and conclusions in this regard are adopted in their entirety and judgment will be entered accordingly.[10]

All remaining claims raised by the landlord are denied.

The Clerk is directed to send a certified copy of this Memorandum Opinion to all counsel of record.

---

**8.** Even if evidence of Cartwright's knowledge had been insufficient, *Batterman* states that a presumption of knowledge by the landlord arises when an adverse condition has existed for some time.  168 N.Y.S. at 199.

**9.** The tenant remains liable, of course, for any unpaid rent that accrued prior to July 9.

**10.** The Bankruptcy Court is instructed to determine the amount of interest and attorneys' fees, if any, recoverable on the notes given by Mullins to Southern Motors.