## Richmond

ESTELLE IRENE STROCK v. NANCY E. MacNICHOLL, SOME-
TIMES KNOWN AS NANCY E. MaxNICHOLL.

January 17, 1955.

Record No. 4309.

Present, Hudgins, C.J., and Spratley, Buchanan, Miller and Smith, JJ.

The opinion states the case.

*Jones, Blechman, Woltz & Kelly* and *L. V. Snell*, for the appellant.

*Kearney, Cofer & Jordan*, for the appellee.

Miller, J., delivered the opinion of the court.

In this suit instituted on November 2, 1951, Estelle Irene Strock sought to have a deed by which she had conveyed valuable real estate to her sister, Nancy E. MacNicholl, declared void because of grantor's alleged incapacity to execute the deed and for fraud in its procurement, or cancelled and rescinded for failure of consideration because of an alleged breach by grantee of a material covenant in the deed. She also undertook to have her rights and ownership to certain personal property on the premises fixed and established.

The deed in question is dated December 27, 1944, but it was actually executed on December 29, 1944. It is made a part of the bill, and in it the consideration for the conveyance is recited to be as follows:

"Now, Therefore, in consideration of natural love and affection, and in further consideration that the grantee herein and her heirs fully shall support and maintain in her usual comfortable employment [enjoyment] and life, the grantor herein doth hereby grant and convey with General Warranty of Title, the following described property, to-wit:"

The property granted consists of certain land described in the deed by metes and bounds, with all improvements thereon, but for brevity, it is designated as 141 Pocahontas Place, Indian River Park, Elizabeth City County, Virginia. It is the residence and adjoining land on which appellant had lived for years.

In her bill appellant alleged that when the deed was executed she was not sufficiently in possession of her faculties to comprehend the consequence of her act and that appellee

never intended to perform her undertaking. It is also charged that appellee had wrongfully asserted ownership over grantor's personal property and wholly failed and neglected to "support and maintain" her as required by the covenant in the deed. She prayed that the deed be declared void as of its execution, or cancelled and rescinded for failure of consideration, and that she be granted general relief.

In her answer appellee denied that she had ill treated appellant or taken her personal property or "anything that has belonged to" her. She asserted that appellant knowingly executed the deed and that there had been no failure of consideration, and alleged that she had supported appellant and "at all times performed and lived up to her agreement."

On August 6, 1953, the court delivered its written opinion. It was to the effect that appellant was competent to execute the deed and that there had been no breach of the covenant by appellee, but that appellee had erroneously entertained the idea that she was entitled to appellant's personal property.

On December 12, 1953, a decree was entered, which refused to avoid or rescind the deed, and it is from that decree that appellant appealed. On December 12, 1953, the court also entered another short decree which fixed the rights of the litigants in the personal property on the premises. It recited that on the motion of complainant the court determined the ownership of the personal property as set out in two itemized lists. These inventories identified 148 articles as owned by appellant, and 139 articles as owned by appellee. When this decree was entered, the lists referred to were dated and marked "filed" by the judge.

█ Cross-error was assigned by appellee to the action of the court in fixing the ownership of the 287 articles of property as set out in the respective lists. The grounds are that title to the personal property was not in issue, and there was no evidence to sustain that decree. When the record was prepared for appeal, the trial judge declined to initial and certify the two lists, but they appear in the original file along with the depositions and bear the notation "Filed

12/12/53, F. A. K., Judge," made when the decree was entered.

It appears from a letter of the trial court to counsel under date of February 16, 1954, that the lists of personal property were presented to the court several months after rendition of its opinion. Yet they were before the court on December 12, 1953, and were then identified and initialed by the judge and are described in the decree and thus constitute a part of the record.

Rule 5:12, § 2, Rules of Court, which prescribes the form and contents of appellee's brief, requires among other things that the brief contain:

"(b) A statement of the case and of the points involved, if the appellee disagrees with the statement of appellant.

"(c) A statement of the facts which are necessary to correct or amplify the statement in appellant's brief in so far as it is deemed erroneous or inadequate, with appropriate references to the pages of the record.

"(d) Argument in support of the position of appellee."

Appellant made no assignment of error to the decree that determined the ownership of the numerous articles of personal property. However, in her opening brief under the heading "Statement of Proceedings in Lower Court," the following statement is made:

"December 12th, 1953, decree was entered establishing the rights of the parties in and to the personalty situated on the premises. This decree was based upon inventories taken by counsel for the parties and filed with the Court, but which inventories have been held by the trial Court not to be a part of the record since they were filed subsequent to the filing of the Court's opinion.

"Note: These inventories were prepared in an effort to carry into effect paragraph 2, page 7, of the Court's opinion, and were referred to in said decree."

Though the court's action in adjudicating the rights of the parties in the numerous articles of personal property is assigned as cross-error by appellee, yet no contradiction is made by her of appellant's assertion that the inventories were

prepared by counsel for the parties and presented to the court to carry into effect a part of the court's opinion. Neither did appellee in her brief undertake to correct or amplify that statement made by appellant, nor did she present any argument in support of her assignment of cross-error. It thus clearly appears that appellee has failed to present to us in her brief her assignment of cross-error as required by Rules of Court, 5:12, § 2 (b), (c) and (d). It necessarily follows that the assignment of cross-error cannot be considered, and the final decree of December 12, 1953, fixing the ownership of the parties in the personal property as set out in the two lists will be affirmed.

Voluminous testimony in deposition form, much of which was irrelevant, was offered by the parties upon the issues as to whether or not appellant was capable of executing the deed, and whether or not there had been a failure of consideration for the conveyance of the real estate due to appellee's neglect to support and maintain appellant. Summarized, the material evidence bearing upon these issues is as follows:

As of the date of conveyance the property was valued at $20,000 to $25,000, but it is now worth considerably more and its rental value is $1,800 or more per annum.

Appellant, who was eighty years of age when the conveyance was made, was a woman of culture and dignity and an artist of talent. She had been a painter and art teacher for many years, and she and her husband maintained a peaceful, happy and comfortable home at 141 Pocahontas Place until his death on February 16, 1943. She was ill herself at the time of his death, and during the following eighteen months or more she did not enjoy the best of health. However, when her strength permitted, she continued her art teaching from which she derived some income and in which she seems to have taken pleasure and pride. Though appellant was advanced in years and failing in health, she continued to care for and live in this property until she was taken ill in December, 1944. At that time her condition became such that it was necessary to remove her

on December 20, 1944, in an ambulance to appellee's home in the city of Newport News, Virginia. It was nine days later and while confined to her bed in appellee's home that she executed the deed in question.

On August 6, 1945, appellee and her husband disposed of their home in Newport News and took up their residence, along with appellant, in the home that had been conveyed to appellee.

When appellee took possession of the residence, she added a new and more commodious kitchen to the building, which she thereafter used in connection with her occupancy and use of the house. Appellant was given the use of a bedroom and studio and the old kitchen, in which she prepared her morning and midday meals, but she took her evening meal with appellee. During the entire time since the deed was executed appellant has paid for and furnished a great part of her own food, and for several months prior to submission of this cause to the trial court for decision, she has furnished, paid for and prepared all of her meals.

At the instance of appellee, Charles Lee Shackleford, a brother of the litigants, took up his residence in the home, and in the differences that thereafter arose between the two sisters, he invariably aligned himself with appellee, and to a minor extent, joined in her criticism of appellant's conduct in the home.

On March 15, 1943, appellant executed a will, which appears to be unrevoked and in which she left all of her property to appellee. Prior to execution of the deed she also wrote a letter to appellee in which she indicated her wish or intent to give or leave to appellee all of her possessions. When appellee moved into the home under the deed of December 1944, she seems to have been under the erroneous impression that the will and the letter had vested her with the ownership of all of appellant's personal property, including valuable furniture, objects of art, and jewelry. From shortly after her entry into the home, appellee became unduly critical of appellant, found fault with her for most trivial matters and abused, vilified and harassed her at times without

reason. She criticized and complained about how appellant cleaned and kept the bathroom, and insisted that she keep it clean and more tidy. She made it a practice to intercept appellant's art students and speak to them of appellant in most derogatory terms, at times charging her with the theft of articles of personal property and the removal of property and shrubs from the premises. This conduct became so offensive and objectionable to the students that they sought to avoid appellee when they went to the studio. At times when appellee visited neighbors and mutual friends of the parties, she took occasion to state that appellant was a liar, untrustworthy and guilty of wrongfully appropriating property to her own use and secretly taking and giving away appellee's china and personal property. She was also critical of the manner in which appellant taught her art students, and on occasions entered the studio and criticized her before her pupils. As time went on, the relations between the parties became so disagreeable and strained that appellant was forced to cease taking her evening meal in appellee's dining room, and at the time appellee's depositions were taken, she had not spoken to appellant for about six months.

Typical of appellee's criticism and vilification of appellant to numerous individuals is a paragraph from a letter written by appellee on September 30, 1950, to an acquaintance of the family in Connecticut. It follows:

"Dear Dot:

"We know sister wrote you last Sunday and God only knows what lies she told. She did me a dirty trick in June and I have not forgiven her and never will—she formulated a lie, I caught her and proved her in it, so of course she was furious and blames me, of course—tells everybody I treat her like a dog—so I have put her in her kitchen where she belongs. She will never use me again—I have been nothing but a negro and a slave for six years—Now let her see how easy she has had it—We have not spoken to her since June. * * *"

Early in 1953 when appellant was quite sick and run

down, she was visited by Dr. Robert H. Wright, Jr., who had been her physician for many years, and he described the condition in which he found her as follows:

"A. * * * Mrs. Strock had had a cold for at least a week. I had noticed that when I had seen her at home. When I saw her on January 26th her cold had grown worse. She had a very severe cough, bronchitis, a sinus condition complicated by her head cold. She had fever and was quite weak and nauseated. I saw no one else at the home on that day or on either of the two subsequent visits that week. There was no food in her room. She had to go downstairs if she called me on the telephone. I administered penicillin by injection and asked my wife to go up to see her and carry some medicine which I had at home for her. I asked Mrs. Wright to see that she got something to eat. By Friday she was considerably improved and I did not make another professional call on her.

"Q. From your observation of her on January 26th and in the light of your experience, doctor, what did you conclude, if anything, about her being in need of nourishment or having had nourishment?

"A. Mrs. Strock was not being fed. It was obvious that she had nothing to eat."

He was so apprehensive and concerned that appellant was receiving no care in the home that he requested his wife to help appellant in her sickness. Upon Mrs. Wright's first visit to the home, she had difficulty securing entrance, and though she made numerous visits over a period of ten days to minister to appellant, she never found that appellee had attended to any of the many needs that such an elderly sick person would require.

Due to this treatment, the relation between these two sisters had become so antagonistic that an altercation arose concerning some rings owned by appellant which appellee seems to have thought she had acquired through appellant's will. On this occasion appellee went so far as to attempt physically to take a ring from appellant's finger, which was

resisted by the latter, and some blows were passed between the two antagonists.

Appellee's statements to appellant's art students and neighbors to the effect that appellant indulged in telling lies and unjustifiably removed property from the premises naturally got back to appellant, and that humiliation and the constant criticism of her by appellee seriously affected her nerves and emotions. At times when she visited friends in the community and heard of these criticisms and abuse, she became so nervous and apprehensive that she feared to return to her home. That appellee did not provide the support and maintenance that she was obligated by the covenant to furnish and did not intend to do so is rather definitely shown by some of appellee's testimony. When questioned concerning her obligation under the covenant, and whether or not she would attend to appellant's needs in case of appellant's sickness, she testified as follows:

"Q. If you were in the physical condition to help her and you knew she was ill would you help Mrs. Strock?

"A. If there was nobody else to do anything for her I would.

\* \* \* \* \* \* \*

"Q. Mrs. MacNicholl, have you supplied Mrs. Strock with one single particle of food within the past six months?

"A. No, I haven't. You want to know why?

\* \* \* \* \* \* \*

"Q. What is your opinion about who owns the personal property there in the house, the jewelry, china, furniture, paintings, etc.?

"A. I do. She gave them all to me.

\* \* \* \* \* \* \*

"Q. What food, if any, have you furnished to Mrs. Strock during the past sx months?

A. Not any.

"Q. Have you spoken to her in the last six months?

"A. No. She hasn't spoken to me. She said she never wanted me to speak to her again."

In their testimony appellee, her husband and brother said that appellee had cared for and waited upon appellant and fulfilled her obligation, and that appellant had voluntarily agreed to furnish part of her food and keep the bathroom clean. Though they admitted that many disagreeable episodes had occurred between the sisters and that their relations were strained, they attributed that condition of affairs to appellant's unreasonable demands, unwarranted acts, disagreeable temperament, and failure to clean the bathroom and try to live in harmony with the other occupants of the home.

Just what constitutes or does not constitute compliance by the obligor with a covenant for support and maintenance of this character is at times difficult to determine. In the nature of things, the line of demarcation between compliance and noncompliance is not clearly drawn. What facts and circumstances constitute a breach of the covenant warranting cancellation of the deed may not be easy of determination. Mere trivial deviation from what should be done by the grantee or failure at times to do and perform all that might reasonably be expected by the grantor, does not necessarily constitute a breach of the covenant. Yet the grantor is entitled to something more than the necessities of life.

In addition to physical necessities, the grantor has the right to expect reasonable personal care and the courtesies and kindness usually obtaining between individuals that have the same ties of blood or association in families of similar station as those of the contracting parties.

"According to the view ordinarily taken, the agreement of a grantee to furnish his grantor support, especially where the parties expect to reside together, is to be construed as contemplating not merely physical necessities, but kindness, and personal care and attention. The correctness of this construction is, of course, the more clear where the contract has been reduced to writing and itself literally calls for

'care.' Moreover, the very fact that, as is ordinarily the case, an agreement contemplates that grantee and grantor shall reside together, is particularly persuasive that an obligation to be kind is an important part of the grantee's undertaking and that mere unkindness may render a decree of rescission appropriate." Note, 112 A. L. R. 670, 708. *Caramini* v. *Tegulias*, 121 Conn. 548, 186 A. 482.

"* * * Where an aged father is induced to convey all of his real estate to his son, in consideration of a promise by the son to support and maintain him, especially where the parties are to reside together, the agreement includes kindness, personal care and attention, as well as the furnishing of food and of shelter. Obviously the son can make his aged parent's life so unpleasant and miserable by cruel, unkind and brutal treatment as to make further living together intolerable. The breach by the child as to matters of kindness and personal care may be so substantial and material as to render the performance of his agreement a thing substantially different from that contemplated and rescission is then a proper remedy." *Mruk* v. *Mruk*, 379 Ill. 394, 400, 41 N. E. (2d) 490. *Bradecich* v. *Rivard, et al.*, 411 Ill. 214, 103 N. E. (2d) 367; *Tysor* v. *Adams*, 116 Va. 239, 81 S. E. 76.

In this covenant the mode of life that the grantor had previously enjoyed was expressly recognized and the blood relationship and station in life of the contracting parties must be taken into account. With these circumstances and conditions in mind, and recognizing the frailities of human nature, the evidence must be justly weighed and the covenant liberally construed in favor of the grantor.

"The agreement for the support of the grantors thus clearly appearing as a substantial part of the consideration for the conveyance, a court of equity will construe it liberally in favor of the grantors, and will find some means for its enforcement. If there be a doubt as to the place or manner of performance, the doubt will be resolved in favor of the beneficiaries. If the relief required is without exact precedent, the court can and will devise a remedy to fit the

circumstances." *Blose* v. *Blose*, 118 Va. 16, 23, 86 S. E. 911. *Chambers* v. *Roper*, 119 W. Va. 338, 193 S. E. 570.

█ If the covenant and agreement for support and maintenance of the grantor constitutes a material part of the consideration for the conveyance, a rescission of the deed may be had in equity where the breach of the covenant has been proved by a preponderance of the evidence and was without justification.

"* * * It will be sufficient to say that it satisfactorily shows that the real consideration for the conveyance sought to be set aside was the support and maintenance of the grantor for life by the grantee; that the latter has not only failed to support and maintain the grantor, but before the institution of this suit, as well as in her answer to the bill and in her deposition, denied that she was under any legal obligation to do so. The consideration of the conveyance for support and maintenance having thus failed, the grantor was entitled, under the decisions of this court in *Wampler* v. *Wampler*, 30 Gratt. (71 Va.) 454, *Lowman* v. *Crawford*, 99 Va. 688, 40 S. E. 17, and *Keister* v. *Cubino*, 101 Va. 768, 45 S. E. 285, to come into a court of equity, because he had no adequate remedy at law, and have the conveyance rescinded." *Martin* v. *Hall*, 115 Va. 358, 361, 79 S. E. 320.

Nor is there a duty upon the beneficiary under a covenant of this character to perform personal services in consideration for the support and maintenance that he is to receive unless that obligation is imposed by the language used in the covenant or clearly inferable therefrom upon a fair construction of the instrument and appraisal of the status and relations of the parties.

"In the absence of an express stipulation of the parties, or some element found in their position or past relationship sufficiently strong to raise an implied condition to the contrary, a beneficiary receiving support and maintenance will not be required to render services in connection therewith." Note, 101 A. L. R. 1461, 1464. *Cummings* v. *Tolman*, 292 Mass. 58, 197 N. E. 476; *Smith* v. *Smith* (1874) 34 Wis. 320; *Alsup* v. *Clarke*, 15 Lea (Tenn.) 71.

Appellee's breach of the covenant was clearly proved. It is continuing and two-fold, for it is of omission and commission. By neglect to provide food and care, she has failed to support and maintain appellant, and, in addition to requiring appellant to perform services not contracted for, she has criticized, abused and vilified her in an unjustifiable manner. The testimony of many witnesses establishes her breach during the past years, and the attitude and testimony of appellee herself unmistakably disclose that she does not intend to perform her obligations in the future. This being true, and appellant being without adequate relief except through rescission of the deed, it necessarily follows that the decree of the trial court must be reversed.

As the deed is to be cancelled and appellant restored to her ownership of the property because of failure of consideration, it becomes unnecessary for us to determine whether or not appellant was incapable of executing the deed or whether there was fraud in its procurement.

For the reasons stated, the decree of the trial court fixing the ownership of the 287 articles of personal property will be affirmed, and the cause will be remanded for such further proceedings as may be necessary and proper to require the respective parties to make delivery to each other of the articles of personal property as set out in the lists mentioned in that decree.

The decree refusing to set aside and cancel the deed of December 27, 1944, will be reversed and the cause remanded for entry of a decree cancelling and setting aside that deed, and restoring appellant to the ownership of the real estate described and conveyed therein as enjoyed by her immediately prior to execution of that instrument, which decree shall be recorded and indexed as required by § 55-138, Code of 1950.

*Affirmed in part, reversed in part, and remanded.*