UNITED STATES of America,
Plaintiff,

v.

0.28 ACRES OF LAND, More or Less, Situated in Buchanan County, Commonwealth of Virginia, et al., Defendants.

No. 1:02CV00201.

United States District Court,
W.D. Virginia,
Abingdon Division.

Dec. 3, 2004.

Russell Vern Presley, II, Street Law Firm, LLP, Grundy, VA, for S.T. Mullins, Trustee of the W. Miller Richardson Testamentary Trust and Miners & Merchants Bank & Trust Company.

Timothy W. McAfee, McAfee Law Firm, P.C., Norton, VA, for Mildred W. Trout.

## OPINION AND ORDER

JONES, Chief Judge.

In this condemnation action by the United States, I am called upon to determine if a lessee continues to have an interest in the property condemned, or whether such interest was forfeited by a failure to pay rent. Based on the record, I find that the lessee has no compensable interest in the property.

### I

The United States, acting by the Secretary of the Army, has condemned the real property that is the subject of this case in connection with the Army Corps of Engineers' Grundy, Virginia, Nonstructural Flood Control Project. The property, taken by declaration filed in this action on November 26, 2002, consists of two parcels located in the Town of Grundy, Virginia, containing a total of .28 acres of land on which was located a commercial building. The government proposes to pay just compensation for the property in the amount of $170,460.

The property was originally owned by W. Miller Richardson. Richardson died November 5, 1996, and by his will devised the property to the W. Miller Richardson Testamentary Trust, of which the defendant S.T. Mullins ("Mullins") is the substitute trustee. Miners & Merchants Bank & Trust Company ("Bank") is also named as a defendant, although its present interest in the property is not apparent from the record.

The present question before the court is whether the defendant Mildred W. Trout has any interest in the condemned property. Mullins and the Bank have moved for summary judgment in their favor on this question. The issues have been briefed and argued and are ripe for decision.

## II

The essential facts of the case, either undisputed or, where disputed, recited in the light most favorable to the non-movant on the summary judgment record, are as follows.

Trout worked for Richardson for many years preparing tax returns, maintaining financial records, and performing other accounting services. On November 15, 1995, Richardson leased to Trout by written lease agreement one-half of the street-level floor of the building located on the property at issue. The initial lease term was for ten years, to begin January 1, 1996. Trout was permitted to renew the lease for eight additional ten-year terms. Trout claims that the purpose of the lease was to make her a retirement gift of an interest in the property, with "minimal" rental payments "so that there would be no question of the Lease's legality" (Trout Aff. ¶ 7), although no such intent is stated in the written lease.[1]

The lease included an option to Trout to rent the remaining one-half of the street-level floor of the building for an additional $50 per month, "should lessor cease to use the space for office storage, or upon the death of lessor." (Lease Agreement § 1(a), 3(a).) On September 12, 1997, after Richardson's death, Trout exercised that option, but the trust failed to honor her request. Instead, Trout claims, the landlord's response was to place security personnel in the building and deny her access to the basement, which the lease made available to her "for storage and access to utilities." (*Id.* § 4.)

Shortly after Richardson's death, Trout assisted his executor with some of Richardson's financial affairs. In November 1997, Trout submitted an invoice for $3,700 to the estate. She contends that the estate never paid the bill.

The lease established a rental fee of $100 per month during the first ten-year term and $110 per month during any subsequent term of years. Following Richardson's death, Trout sent her $100 monthly rental payments to the then-trustee, and began sending her payments to Mullins after his substitution as trustee. Trout mailed her payments to a third party after Mullins instructed her to do so in January 2000; however, that third party never presented any of the checks for payment. (Trout Aff. ¶ 17.)

Trout became upset with the third party's failure to present her checks and the failures to abide by the terms of her lease and compensate her for services performed. In addition, Trout contends that the estate owed her $2,245 after selling items of her personal property at a November 17, 2001, estate sale, and $700 for the wrongful conversion of other personal property. Frustrated, Trout stopped paying rent. (*Id.* ¶ 16.)

On May 31, 2002, Mullins sent Trout written notice to vacate the premises within sixty days for failure to pay rent. A police officer delivered the notice. Trout remained in possession and on July 26, 2002, Mullins instituted an unlawful entry

---

1. The lease agreement contains no express remedy for failure to pay rent, and Trout argues that the absence of such a provision supports her claim as to the purpose of the lease. As later discussed, however, Virginia law affords a remedy for the landlord even in the absence of an express lease provision.

and detainer action against her in a state court.[2] Still, Trout remained in possession without paying rent until ousted by the government in connection with this condemnation.

## III

Summary judgment is appropriate when there is "no genuine issue of material fact," given the parties' burdens of proof at trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see* Fed.R.Civ.P. 56(c). In determining whether the moving party has shown that there is no genuine issue of material fact, a court must assess the factual evidence and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *See Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985), *overruled on other grounds, Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." *Id.* at 327, 106 S.Ct. 2548. It is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt,* 999 F.2d 774, 778–79 (4th Cir.1993) (internal quotation marks omitted).

A lessee of real estate has an interest requiring compensation when the property is taken for public purposes. *See United States v. Atomic Fuel Co.,* 383 F.2d 1, 2 (4th Cir.1967). In federal condemnation cases where the property is subject to a valid lease, the court must first determine the value as if the property were held in single ownership, and then divide the award as between the separate interests. *See Bogart v. United States,* 169 F.2d 210, 213 (10th Cir.1948). Where, as here, there is a long-term lease, the value of the leasehold interest may well exceed the proportionate value of the landlord's reversionary interest. *See Devers v. Chateau Corp.,* 792 F.2d 1278, 1284 (4th Cir.1986). In the present case, the conflicting claimants do not dispute the government's evaluation of the whole, but do dispute which of them is entitled to payment. Mullins and the Bank contend that Trout's leasehold interest was forfeited prior to the government's taking because of her failure to pay the stipulated rent and thus she is entitled to no part of the compensation.

Under Virginia law,

[i]f a tenant or lessee of premises in a city or town ... being in default in the payment of rent, shall so continue for five days after notice, in writing, requiring possession of the premises or the payment of rent, such tenant or lessee shall thereby forfeit his right to the possession.

Va.Code Ann. § 55–225 (Michie 2003). Trout admits that she stopped paying rent sometime after January 2000. She received the statutory notice to vacate on May 31, 2002, but still failed to pay. In spite of these uncontested facts, Trout advances several arguments in support of her contention that her leasehold interest was still in existence as of the date of the

---

**2.** For some reason not apparent in the record, no judgment was ever entered in that action.

taking by the United States, and that she therefore has a compensable interest in the property. She claims that the landlord took actions resulting in both constructive eviction and material breach of the lease agreement, and that those actions barred it from terminating her leasehold interest. Additionally, Trout argues that the doctrine of laches supports her claim to a leasehold interest in the property.

Trout asserts many of her claims against both "the Estate and the Trust," although only the trust is party to this suit. (*See* Trout Aff. ¶¶ 11, 16.) The estate and trust are separate and distinct entities. However, even if all of Trout's claims were against only the trust, and all inferences are viewed in the light most favorable to her, I find that Trout still has failed to create a genuine issue of material fact as to whether she had any interest in the condemned property.

**A**

Trout claims that she was constructively evicted her from the property and that the landlord materially breached the lease agreement.

■ In Virginia, "[a]n intentional act or omission by the landlord, depriving the tenant of possession or beneficial use of the leasehold, *together with* abandonment by the tenant within a reasonable time constitutes constructive eviction." Jerome P. Friedlander, II, *Quiet Possession and Constructive Eviction, in* Va. Prac. Landlord–Tenant § 6:5 (2004 ed.) (emphasis added); *see also S. Motors, Inc. v. Va. Nat. Bank,* 73 B.R. 261, 264 (W.D.Va.1987) (stating the general rule that a tenant claiming constructive eviction must abandon the premises within a reasonable time), *aff'd,* 829 F.2d 1120, 1987 WL 38633 (4th Cir.1987). In addition, the tenant must abandon the property as a result of the condition creating the alleged con-

structive eviction, and not for some other reason. *See* Friedlander, *supra.* Constructive eviction is an affirmative defense; therefore, the burden is on the lessee who asserts it. *See Cavalier Square Ltd. P'ship v. Va. Alcoholic Beverage Control Bd., Dep't of Alcoholic Beverage Control, Commonwealth,* 246 Va. 227, 435 S.E.2d 392, 395 (1993).

Trout claims that the landlord constructively evicted her when it "denied [her] access to a significant area of the leased premises" and that this eviction relieved her of any obligation to pay rent. (Pl.'s Resp. Mot. Summ. J. at 7.) Specifically, Trout claims that the landlord "re-keyed" the office, preventing her from accessing all but one-half of the street-level floor of the building, and denied her access to the basement, which the lease made available to her "for storage and access to utilities." (*Id.* at 5.)

■ The landlord's actions did not deprive Trout of possession or beneficial use of the leasehold. When the landlord changed the locks, it blocked Trout from accessing other parts of the building, but those areas were not included in Trout's lease agreement. While it is true that the landlord denied Trout basement access, the lease gave Trout only a limited "right of access" to the basement—she did not rent that portion of the building. Furthermore, Trout does not claim that the denial interfered with her possession or use of that part of the building where her business was housed.

■ Most importantly, Trout failed to abandon the premises, as is required for constructive eviction. Constructive eviction provides a tenant with the right to abandon the premises and stop paying rent, not the ability to continue in possession rent-free. Trout did not abandon the premises until she was ousted by the gov-

ernment years after the alleged constructive eviction. Even then, she did not leave as a result of the conditions creating the alleged constructive eviction, but because the government gave her no other choice. Even considering all facts in the light most favorable to Trout, as a matter of law there was no constructive eviction.

■■■ Next, Trout claims that the landlord materially breached the lease agreement, barring a termination of her interest. Not every failure to perform a contractual obligation is a material breach that excuses performance by the non-breaching party. Rather, "the act failed to be performed must go to the root of the contract." *Neely v. White*, 177 Va. 358, 14 S.E.2d 337, 341 (1941). "A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Horton v. Horton*, 254 Va. 111, 487 S.E.2d 200, 204 (1997). Viewing the principle another way, a breach of a contract cannot be material if the breaching party has rendered substantial performance, which is performance not in every detail, but in all essential parts. *See* 15 Richard A. Lord, *Williston on Contracts* § 44.54 (4th ed.2000). The aggrieved party bears the burden of proving material breach. *See Strock v. MacNicholl*, 196 Va. 734, 85 S.E.2d 263, 270 (1955).

The lease provided that in consideration of $100 per month, Richardson promised to "lease one-half of the street-level floor of the 'Richardson Annex Building'" to Trout. The landlord honored this portion of the contract. However, the lease agreement further provided that Richardson "desire[d] to grant an option to lease the remaining one-half of the street-level floor" should he cease to use that space for his own storage or upon his death. (Lease Agreement ¶ 3.) The contract provided

that, should Trout exercise the option, she would pay an additional $50 per month in rent. (*Id.* ¶ 3(a).) The landlord allegedly did not honor this lease provision.

It does not appear that the landlord's breach was material in nature. No actual benefit was lost when the landlord failed to conform to the lease. There was a condition precedent to Trout's exercise of the option and there was no guarantee when Trout would be able to rent the additional portion of the Richardson Annex Building. Because the option did not go to the "root of the contract," the breach was most likely a partial one.

■■■ Even assuming, however, that the failure to honor Trout's option was a material breach, it did not bar the landlord from terminating Trout's leasehold interest, as she contends. Material breach of a lease agreement by a landlord entitles the tenant to terminate the lease or bring an action in damages for total breach. *See Siemark Corp. v. Ningbo Haitian Machinery Co.*, 1997 WL 1070617, *1 (Va. Cir. Ct.1997) (citing *RW Power Partners, L.P. v. Va. Elec. and Power Co.*, 899 F.Supp. 1490, 1501 (E.D.Va.1995)). Trout did not seek either of these remedies—she did not treat the lease as terminated because she continued in possession, and she did not institute a suit for material breach. I find that, as a matter of law, Trout has failed to show how any breach of the lease agreement now entitles her to share in the condemnation award.

B

■■■ Trout argues that the common law doctrine of laches bars the defendants' effort to win a judgment that her leasehold interest was terminated prior to the condemnation. The Supreme Court of Virginia has described laches "as an omission to assert a right for an unreasonable and

unexplained length of time, under circumstances prejudicial to the adverse party." *Finkel Outdoor Prods., Inc. v. Bell,* 205 Va. 927, 140 S.E.2d 695, 699 (1965), *abrogated on other grounds, Heyward & Lee Constr. Co., Inc. v. Sands, Anderson, Marks & Miller,* 249 Va. 54, 453 S.E.2d 270 (1995). No set amount of time automatically makes a delay unreasonable; it depends on the circumstances of each case. *See Berglund Chevrolet, Inc. v. Landrum,* 43 Va.App. 742, 601 S.E.2d 693, 699 (2004). Most importantly, mere lapse in time is not enough to prove laches. *Holmberg v. Armbrecht,* 327 U.S. 392, 396, 66 S.Ct. 582, 90 L.Ed. 743 (1946). The doctrine asks whether a party "has inexcusably slept on his rights," making judgment in his favor "unfair." *Id.; see also Gilley v. Nidermaier,* 176 Va. 32, 10 S.E.2d 484, 489 (1940) (explaining that delay must be accompanied by circumstances leading to a presumption that a right has been abandoned).

■ Laches is an equitable remedy, most commonly asserted as an affirmative defense for which the claimant bears the burden of proof. *See* 27 Am.Jur.2d *Equity* § 140 (2004). The elements necessary to invoke a laches defense are: "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Mogavero v. McLucas,* 543 F.2d 1081, 1083 (4th Cir.1976) (quoting *Costello v. United States,* 365 U.S. 265, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961)).

■ Having thoroughly reviewed all the evidence presently in the summary judgment record and viewing all inferences in the light most favorable to the non-movant, I find that Trout has failed to create a genuine issue of material fact as to whether she is entitled to a laches defense. Trout admits that she stopped paying rent long before the condemnation and fails to present facts justifying application of the equitable defense.

In support of her argument, Trout cites the defendants' delay in contesting her leasehold interest, as well as a number of sharp practices—the alleged breaches of the lease agreement, the failure to reimburse her for wrongfully converted personal property, and the failure to compensate her for services she performed for the estate.

Trout has failed to prove that the landlord delayed in bringing the state court eviction action against her for an unreasonable and inexplicable amount of time, effectively "sleeping on its rights" until such a time when judgment in its favor would be unfair. *See Holmberg,* 327 U.S. at 396, 66 S.Ct. 582; *Finkel,* 140 S.E.2d at 699. There is some dispute over exactly how long the landlord in this case waited before filing its unlawful entry and detainer action.[3] Even if the delay was as long as Trout urges, nearly six years, it was not unreasonable. The amount in controversy was certain, $100 per month. The delay was not so long that evidence related to the landlord's claim was lost, witnesses made unavailable, or opportunities to mitigate damages missed. Trout was aware of her duty to pay rent and could not have assumed from the delay that the landlord had abandoned its right to collect such rent. That is why she made payments to Horne, then Mullins, and then a third party.

---

**3.** Trout argues that the landlord waited six years, alleging that when Mullins first filed the action he mistakenly believed Trout had paid no rent since Richardson's death in 1996. Mullins and the Bank now claim that Trout stopped paying rent in February 1999. Trout claims that she began mailing her checks to a third party in January 2000, and stopped paying rent some time after that.

Moreover, Trout has been unable to show how any delay prejudiced her. She does not allege that she changed her position in reliance on the delay. She does not allege any detriment to the business she operated out of the building; in fact, she continued in possession until ousted by the government at the time of the condemnation. Trout does state that

[i]f I had known that the persons representing the Estate would now be attempting to take away my retirement, I would certainly have acted differently. I chose not to pursue these items of property that were rightfully mine because I did not want to be contentious. It never occurred to me until I received a letter from S.T. Mullins in May 2002 wherein I was being ordered to vacate the property that the Estate/Trust were doing things to prevent me from receiving ... what I believe that I am entitled to.

(Trout Aff. ¶ 15.) However, this statement reveals that Trout herself attributes any change in her position to the desire to avoid being "contentious," and to the fact that she did not realize what the stakes were. She does not claim that her most prejudicial decision, the decision to stop paying rent, was in any way connected to a delay on the part of the landlord. Instead, she admits the decision stemmed from her "frustration" with the trust and the estate. (*Id.* ¶ 16.)

Furthermore, Trout does not allege that the delay has made it difficult for her to vindicate her rights. Adequate remedies were available to Trout to seek relief from the trust's and estate's actions at the time they occurred. She could have sued for damages resulting from the alleged breaches of the lease agreement, or claimed constructive eviction at the time of breach and abandoned the premises. Likewise, she could have sued for damages

resulting from the alleged conversion of her personal property, or nonpayment of the debt relating to financial services she performed.

Finally, the existence of the equitable defense of laches "is a question primarily addressed to the discretion of the trial court." *Gardner v. Panama R.R.*, 342 U.S. 29, 30, 72 S.Ct. 12, 96 L.Ed. 31 (1951). The court must consider "[t]he equities of the parties." *Id.* at 31, 72 S.Ct. 12. In this case, the equities weigh in favor of the landlord. There is nothing to show that any delay was either unreasonable or injurious to Trout.

Some of Trout's arguments imply that her failure to pay rent is a technicality that may be disregarded because her leasehold interest was arguably meant to provide her a retirement benefit, particularly in the event that the property was ever taken in condemnation. However, the written lease on which her case depends provides Trout no such beneficence. Under long-standing and familiar principles of law, I am not permitted to ignore the written agreement of the parties and instead rely on possible unwritten understandings, particularly where one of the parties to the contract is no longer able to speak to his intent.

Considering all evidence in the light most favorable to her, I find that Trout had no interest in the property that is the subject of this condemnation. Her rights were extinguished when she received notice to vacate the premises for failure to pay rent and failed to appropriately respond. Accordingly, summary judgment in favor of the movants must be granted.

## IV

For the foregoing reasons, it is **ORDERED** that the Motion for Summary Judgment by S.T. Mullins, Trustee of the W. Miller Richardson Testamentary Trust

and Miners & Merchants Bank and Trust Company is **GRANTED** and the court declares that Mildred Trout had no compensable interest in the property that is the subject of this action as of the time of taking by the United States.